No. 13-1626

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**LEON COURSEY**

**Plaintiff-Appellant**

v.

**UNIVERSITY OF MARYLAND EASTERN SHORE, ET AL.**

**Defendants-Appellees**

_____

Appeal from the United States District Court
for the District of Maryland
(Honorable Catherine C. Blake)

_____

BRIEF OF APPELLANT

_____

ROBIN R. COCKEY
COCKEY, BRENNAN & MALONEY, PC
313 Lemmon Hill Lane
Salisbury Maryland 21801
(410) 546-1750
*Attorney for Appellant*

**DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER
ENTITIES WITH A DIRECT FINANCIAL INTEREST IN LITIGATION**

Only one form need be completed for a party even if the party is represented by more than one attorney.

Disclosures must be filed on behalf of individual parties as well as corporate parties. Disclosures are required from amicus curiae only if amicus is a corporation. Counsel has a continuing duty to update this information. Please file an original and three copies of this form.

No. 13-1626     Caption:     Leon Coursey v. University of Maryland Eastern Shore, et al.

Pursuant to FRAP 26.1 and Local Rule 26.1, Leon Coursey     who is Appellant     makes the following disclosure:

1 .   Is party/amicus a publicly held corporation or other publicly held entity?

        ( ) YES        ( X ) NO

2.    Does party/amicus have any parent corporations?

        ( ) YES        ( X ) NO

        If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3 .   Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?

        ( ) YES        ( X ) NO

        If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?

        ( ) YES        ( X ) NO

        If yes, identify entity and nature of interest:

5.    Is party a trade association?

        ( ) YES        ( X ) NO

        If yes, identify all members of the association, their parent corporations, and any publicly held companies that own 10% or more of a member's stock:

_____/s/_____    June 21, 2013_____
      (signature)                     (date)

i

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT .......................................................i

TABLE OF CONTENTS......................................................................... ii

TABLE OF AUTHORITIES .................................................................. iii

JURISDICTIONAL STATEMENT ...........................................................1

ISSUES PRESENTED...........................................................................1

STATEMENT OF THE CASE................................................................2

STATEMENT OF THE FACTS ..............................................................3

STANDARD OF REVIEW ....................................................................9

SUMMARY OF ARGUMENT ...............................................................9

ARGUMENT .....................................................................................11

    I.    THE DISTRICT COURT ERRED SIGNIFICANTLY BY DETERMINING THAT APPELLEES' DEMAND FOR A FITNESS FOR DUTY EXAMINATION WAS CONSISTENT WITH A BUSINESS NECESSITY ....................................................11

    II.    THE DISTRICT COURT ERRONEOUSLY DETERMINED, AS A MATTER OF LAW, THAT DR. COURSEY FAILED TO PRESENT A *PRIMA FACIE* CASE OF RETALIATION UNDER THE ADA.....17

    III.    THE DISTRICT COURT ERRONEOUSLY DETERMINED, AS A MATTER OF LAW, THAT DR. COURSEY FAILED TO PRESENT A *PRIMA FACIE* CASE OF DISCRIMINATION ..............................22

CONCLUSION.................................................................................27

REQUEST FOR ORAL ARGUMENT ..................................................29

CERTIFICATE OF COMPLIANCE.......................................................30

CERTIFICATE OF SERVICE ..............................................................31

## TABLE OF AUTHORITIES

**CASES**                                                                    **PAGE**

*Allen v. Interior Const. Services, Ltd.*, 214 F.3d 978 (8th Cir. 2000) ....................21

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986)...............................................9

*Baird ex rel. Baird v. Rose*, 192 F.3d 462 (4th Cir. 1999)........................................23

*Campbell v. Prince George's County Maryland*, 2001 WL 706039 (D. Md.) .......21

*Dugan v. Albemarle County Sch. Bd.,* 293 F.3d 716 (4th Cir. 2002) ......................21

*Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.,* 53 F.3d 55 (4th Cir. 1995) ......... 23

*Farrell v. Planters Lifesavers Co.,* 206 F.3d 271 (3d Cir.2000) ...........................18

*Freilich v. Upper Chesapeake Health, Inc.*, 313 F.3d 205 (4th Cir. 2002)............17

*Kim v. MedImmune, Inc.*  2004 WL 3313219 (D. Md. 2004) .................... 12, 13, 16

*Lassiter v. Reno*, 86 F.3d 1151 (4th Cir. 1996)......................................... 23

*Lettieri v. Equant Inc.,* 478 F.3d 640 (4th Cir. 2007) ......................................18, 19

*Malone v. Greenville County,* 2008 WL 4557498 (2008)......................................11

*Porter v. U.S. Alumoweld Co., Inc.,* 125 F.3d 243 (4th Cir. 1997) ..................12, 22

*Pueschel v. Peters,* 577 F.3d 558 (4th Cir. 2009).......................................................9

*Rhoads v. FDIC,* 257 F.3d 373 (4th Cir.2001) .............................................. 17, 21

*Santiago-Ramos v. Centennial P.R. Wireless Corp.,* 217 F.3d 46 (1st Cir. 2000)... 9

*Shipbuilders Council of Am. v. U.S. Coast Guard,* 578 F.3d 234 (4th Cir. 2009) ....9

*Sullivan v. River Valley Sch. Dist.,* 197 F.3d 804 (6th Cir. 1999)...........................13

*Thomas v. Corwin*, 483 F.3d 516 (8th Cir. 2007)....................................................15

*Tice v. Centre Area Transp. Authority,* 247 F.3d 506 (3rd Cir. 2001) .............15, 25

*Wolfe v. Postmaster Gen.*, 488 F. App'x 465 (11th Cir. 2012)................................24

## STATUTES, RULES, & CONSTITUTIONAL PROVISIONS      PAGE

Fed.R.Civ.P. 56(c)........................................................................................ 9

28 U.S.C.A § 1291 ........................................................................................1

28 U.S.C.A § 1331 ........................................................................................1

29 U.S.C.A. § 705 ........................................................................................24

42 U.S.C.A. § 12102 ................................................................................... 24

42 U.S.C.A. § 12112................................................................................ 12, 22

29 CFR § 1630.2 ........................................................................................24

## JURISDICTIONAL STATEMENT

Pursuant to 28 U.S.C. § 1331, Appellant, Leon Coursey, Ph.D. ("Dr. Coursey"), filed suit in the United States District Court for the District of Maryland against his former employer, University of Maryland Eastern Shore ("UMES" or "University"), and the State of Maryland ("Maryland") (collectively, "Appellees")[1]. Dr. Coursey asserted claims against Appellees under the Americans with Disabilities Act, the Rehabilitation Act of 1973, the Due Process Clause of the Fourteenth Amendment pursuant to 42 U.S.C. § 1983, and the common law of Maryland.  Joint Appendix ("JA") 6-16.  By Order dated April 30, 2013, the District Court granted the University's Motion for Summary Judgment, dismissing Dr. Coursey's claims in their entirety.  *Id.* at 401.   Dr. Coursey timely noted an appeal on May 9, 2013 *Id.* at 402  Accordingly, under 28 U.S.C. § 1291, this appeal is properly before the United States Court of Appeals for the Fourth Circuit, as the appeal arises from a final order of the District Court disposing of all claims with respect to all parties.

## ISSUES PRESENTED

1.    Did the District Court erroneously determine that Appellees' fitness for duty request was consistent with a business

---

[1] Appellant sued the University of Maryland Eastern Shore as an instrumentality of the State of Maryland.  While the State has never filed a responsive pleading in this matter, given the relationship between the two Defendants, Appellant considers the pleadings of the University of Maryland Eastern Shore to have been submitted on behalf of the State of Maryland.

necessity?

2.     Did the District Court erroneously determine that Dr. Coursey failed to present a *prima facie* case of discrimination and retaliation?

## STATEMENT OF THE CASE

Dr. Coursey brought suit against Appellees for causes of action arising out of the termination of his employment with UMES.  Specifically, Dr. Coursey alleged violations of the Americans with Disabilities Act ("ADA"), the Rehabilitation Act of 1973 ("Rehabilitation Act"), the Due Process Clause of the Fourteenth Amendment pursuant to 42 U.S.C. § 1983, and the common law of Maryland.  Dr. Coursey alleged discrimination and retaliation under the ADA, and also asserted a claim that UMES violated the ADA by demanding he submit to an unlawful fitness for duty evaluation.  Appellant further asserted a claim of discrimination pursuant to the Rehabilitation Act. On September 11, 2012, after the close of discovery, Appellees moved for summary judgment.  On April 30, 2013, the District Court granted the dispositive motion, dismissing Dr. Coursey's claims in their entirety.  Dr. Coursey appeals the District Court's grant of summary judgment only as to his claims of discrimination under the ADA and Rehabilitation Act, retaliation under the ADA, as well as his claim that UMES attempted to subject him to an unlawful fitness for duty examination.

2

## <u>STATEMENT OF THE FACTS</u>

Dr. Coursey was hired by UMES in 1972 as an Assistant Professor. JA 247. During his 38 year tenure with UMES, Dr. Coursey soared through the academic ranks, first becoming an Associate Professor in 1973, and eventually a full professor in 2001. *Id.* During these years, Dr. Coursey continued at the forefront of faculty activities on campus, serving on enumerable committees and representing UMES in joint ventures with Salisbury University. *Id.* at 257-78. Dr. Coursey also served in a number of supervisory positions, including Dean of the School of Professional Studies, Chair of the Department of Physical Education and Director of the Department of Athletics. *Id* at 260 & 52 ("Dr. Coursey was originally hired as department chair for the Physical Education department and Athletics Director").

During his tenure, Dr. Coursey remained committed to his students, often personally financing their academic ventures. *Id.* at 174 (Appellant's former Administrative Assistant asserted "Dr. Coursey supported students' field trips and activities, and purchases their books with personal finances without students' knowledge of the source of the funds."). In fact, many of Dr. Coursey's students later secured employment at UMES. *Id.* at 95 ("Some of the former students, who are now high-ranking administrators and managers, testified to the appropriateness of instruction they received from Dr. Coursey when taking his classes. The positive

3

influence Dr. Coursey had on many is a great testimony to him as a teacher.").

Despite this impressive track record, on February 3, 2009 a uniformed security guard appeared in Dr. Coursey's office and presented him with correspondence identifying that he had been placed on administrative leave. *Id.* at 279; 172 ("Dr. Coursey explained in detail the humiliation and mental anguish he had endured by being sent off campus with police escort"). Pursuant to this correspondence, Dr. Coursey was removed from all classes and prohibited from entering campus. *Id.* Dr. Coursey was physically escorted from the University by campus security, and directed to have no contact with his students until further notice. *Id.* Prior to his February 3, 2009 removal, Appellant was unaware of any allegations of misconduct or complaints regarding his teaching. *Id.* at 280. Dr. Coursey thereafter filed a timely grievance challenging his removal and the allegations contained in the February 3, 2009 notice of administrative leave. *Id.*

In response to Dr. Coursey's grievance, a hearing was conducted by the UMES Faculty Grievance Hearing Board ("Grievance Board") on May 14, 2009. *Id.* at 281. During the hearing, the testimony of 18 witnesses was presented, including that of Dr. Coursey and several of his students. *Id.* at 282. Both parties made opening and closing statements. *Id.* Prior to the hearing, Nicholas Blanchard, Ph.D. ("Dr. Blanchard") was charged with conducting an investigation into the alleged complaints necessitating Dr. Coursey's removal. *Id.* at 309. Dr. Blanchard

reduced the alleged complaints to three categories: arbitrary and capricious grading; inappropriate behavior in the classroom; inappropriate behavior outside of the classroom. *Id.* The testimony and arguments advanced by UMES during the hearing centered on Dr. Coursey's teaching style, classroom methodologies, and relationships with students and colleagues. *Id.* at 285-308. After deliberations, the Grievance Board voted unanimously that Dr. Coursey was improperly removed from the University and recommended that he be allowed to return to his regular teaching duties. *Id.* at 282-83. The Grievance Board also determined that, to the extent UMES received complaints from students regarding Dr. Coursey's grading, the students should be informed of their right to initiate action under the University's policies and procedures on arbitrary and capricious grading. *Id.* At the time of the hearing it was undisputed there were no pending complaints against Dr. Coursey pursuant to the University's policies on arbitrary and capricious grading. *Id.*

Under the University of Maryland System Policy, the Grievance Board's recommendation was to be acted upon by then President Dr. Thelma Thompson ("President Thompson") within thirty days. *Id.* at 316. Rather than render a decision, on June 4, 2009, President Thompson issued correspondence to the Vice President of Academic Affairs identifying that "in accordance with [the Grievance Board's] recommendation, I am requesting...Dr. Coursey to have a medical and/or

5

mental health evaluation." *Id.* at 317.  When the Chair of the Grievance Board, Robert B. Dadson ("Dr. Dadson"), learned of this request, he directed correspondence to President Thompson confirming that he received the President's letter stating she was "accepting the Board's recommendation to have Dr. Coursey evaluated for fitness for duty by medical/psychological professions." *Id.* at 318. Dr. Dadson's correspondence, however, goes on to state that "I wish to humbly apprise you that the Board did not make any such recommendation for fitness of duty by medical/ psychological professional." *Id.*

Despite clarification from the Chair of the Grievance Board that no recommendation was made for Dr. Coursey to undergo a fitness for duty examination, President Thompson persisted with her demand. *Id.* at 319-21.  Dr. Coursey, who was aware the Grievance Board had not recommended a fitness for duty evaluation, and who was not mentally ill, declined to undergo a fitness for duty evaluation and filed a complaint under the Americans with Disabilities Act with the Equal Employment Opportunity Commission ("EEOC").  *Id.* at 331-33. Dr. Coursey's EEOC Charge of Discrimination asserted that the University was penalizing him because of a bogus perception that he was disabled. *Id.*

On May 26, 2010, UMES issued "Charges for Termination" of Dr. Coursey's tenured employment with the University.  *Id.* at 334- 339. The grounds for terminating Dr. Coursey mirrored those on which his February 3, 2009 removal

was predicated.  In support of Appellant's termination, UMES now categorized the student grade complaints as "incompetence," and deemed the interactions with colleagues to be "professional misconduct."  *Id.* The sole exception is that the Charges for Termination also alleged that Dr. Coursey was insubordinate by refusing to participate in the fitness for duty evaluation. *Id.*

Dr. Coursey appealed his termination and a second Faculty Grievance Hearing Board ("Termination Board") was convened. *Id.* at 360-67.  Prior to the presentation of evidence, Dr. Coursey's legal counsel noted that all allegations regarding the charges of professional misconduct and incompetence were already decided by the Grievance Board and should therefore be excluded from the termination proceedings. *Id.* at 369-70. Dr. Coursey, through counsel, also objected to the presentation of evidence regarding his alleged insubordination, on the basis that insubordination is not a terminable offense under the policies of the Board of Regents. *Id.*

Over Appellant's objection, the Termination Board went forward with the proceedings.  The hearing before the Termination Board was analogous to that conducted by the prior Grievance Board, and included many of the same witnesses and exhibits. For example, in support of the incompetence charge, student grade complaints and evidence of Dr. Coursey's dislike for computerized teaching aids was presented; in support of the professional misconduct charge, rumors and

7

accusations of sexual harassment and disputes with coworkers; in support of the

insubordination charge, evidence of Dr. Coursey's refusal to submit to a fitness for

duty evaluation. *Id.* at 360-67. Counsel for UMES also entered into evidence

copies of Dr. Coursey's EEOC filing, and informed the Board that the EEOC

proceeding was going forward due to Dr. Coursey's failure to agree to a settlement.

*Id.* at 371-75. In the wake of this presentation, Dr. Coursey amended his EEOC

filing to add charges that the University was retaliating against him for filing his

initial EEOC complaint. *Id.* at 376-78.

Ultimately, the Termination Board issued a report recommending the

termination of Dr. Coursey on the grounds of insubordination, incompetence and

professional misconduct. *Id.* at 360-67. Thereafter, oral arguments were conducted

before President Thompson who issued correspondence adopting their

recommendation and officially terminating Dr. Coursey. In her termination letter

dated December 17, 2010, President Thompson, for the first time, addressed the

recommendation of the prior Grievance Board and held that she was rejecting the

Grievance Board's recommendation to reinstate Dr. Coursey, and accepting the

Termination Board's recommendation to terminate him. *Id.* at 379-81. Dr.

Coursey appealed his termination to the University System of Maryland Board of

Regents. Oral argument was held before the Board of Regents on May 27, 2011

and a decision was issued on June 21, 2011 upholding Dr. Coursey's termination.

*Id.* at 246-56.   This lawsuit followed.

## STANDARD OF REVIEW

The Court of Appeals reviews the District Court's grant of summary judgment *de novo*. *Shipbuilders Council of Am. v. U.S. Coast Guard,* 578 F.3d 234, 243 (4th Cir. 2009). Summary judgment is appropriate only "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).  An issue is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party," *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986), and a fact is "material" if it has the "potential to affect the outcome of the suit." *Santiago-Ramos v. Centennial P.R. Wireless Corp.,* 217 F.3d 46, 52 (1st Cir. 2000) (internal quotation marks omitted).  To the extent facts are disputed, the court must view those facts in a light most favorable to the non-moving party.  *Pueschel v. Peters,* 577 F.3d 558, 563 (4th Cir. 2009).

Thus, in this case, the District Court's judgment may be upheld only if that judgment is correct as a matter of law and there are no material factual disputes, even viewing the facts in the light factorable to the Appellant, Dr. Coursey.

## SUMMARY OF ARGUMENT

It is undisputed the Grievance Board did not recommend that Dr. Coursey undergo a fitness for duty examination. Nonetheless, UMES claimed to rely exclusively on the nonexistent recommendation in support of its demand that Dr. Coursey submit to a "medical and/or mental health evaluation." The lower court therefore erred in dismissing Dr. Coursey's ADA fitness for duty claim, as the University's request could not have been job-related and consistent with a business necessity when the proffered basis for the exam was factually incorrect and manifestly a pretext.

Dr. Coursey presented evidence that not only were charges of termination issued shortly after he complained to the EEOC, but that UMES actually offered copies of his EEOC Complaint into evidence for the Termination Board to consider. In doing so, UMES explicitly and indisputably retaliated against Dr. Coursey for making a protected complaint. Obviously, the University did not have another basis for Dr. Coursey's termination because the Grievance Board reviewed his performance and recommended he be reinstated. Viewing these facts in the light most favorable to Appellant, judgment, as a matter of law, cannot be entered with respect to Dr. Coursey's retaliation claim. Clearly, a rational fact-finder could determine that Appellant's job performance met expectations and, as a result, Dr. Coursey was terminated in retaliation for complaining to the EEOC.

Finally, the District Court improperly dismissed Dr. Coursey's discrimination claims on the basis that he was not "regarded as" disabled. In order to establish that an employee is "regarded as" disabled, the ADA merely requires a showing that the employee has been subjected to a prohibited action because of an actual or perceived physical or mental impairment. Here, UMES undoubtedly believed Dr. Coursey possessed a mental impairment which necessitated his police-escorted removal from campus. Certainly such drastic measures would not have been needed if UMES did not regard Dr. Coursey as disabled. Thus, at the very least, Dr. Coursey has presented a jury question on this issue.

## ARGUMENT

**I.  THE DISTRICT COURT ERRED SIGNIFICANTLY BY DETERMINING THAT APPELLEES' DEMAND FOR A FITNESS FOR DUTY EXAMINATION WAS CONSISTENT WITH A BUSINESS NECESSITY.**

Count I of Dr. Coursey's Amended Complaint alleges that UMES violated the Americans with Disabilities Act by demanding that he submit to an unlawful fitness for duty evaluation, and then firing him when he refused to participate. JA 26-27. *See*, *Malone v. Greenville County,* 2008 WL 4557498 (2008)(identifying that a claim under the ADA for an improper medical examination is separate and distinct from a claim of discrimination). The District Court dismissed this claim

11

and held that the University's request for Dr. Coursey to undergo a fitness for duty examination was consistent with a business necessity, and therefore legal.  JA 397.

The ADA provides that an employer is prohibited from requiring a medical examination or making inquiries of an employee as to whether he is an "individual with a disability or as to the nature or severity of the disability unless such examination or inquiry is shown to be job-related and consistent with business necessity." *Porter v. U.S. Alumoweld Co., Inc.,* 125 F.3d 243, 246 (4th Cir. 1997). Specifically, 42 U.S.C.A. § 12112 (d)(4)(A) provides that "a covered entity shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity."

In discussing the Americans with Disabilities Act, the Fourth Circuit noted that employers may "make inquiries or require medical examinations (fitness for duty exams) when there is a need to determine whether an employee is still able to perform the essential functions of his or her job." *Porter,* at 246. *(quoting* 29 C.F.R. Part 1630, App. § 1630.14(c)).  For example, an employer's request for a fitness for duty exam after an on-the-job injury is clearly job-related and meets a business necessity.  *Id.*  The United States District Court for the District of Maryland in *Kim v. MedImmune, Inc.* 2004 WL 3313219, 2 (D. Md. 2004) quoted

12

EEOC Enforcement Guidance on this issue which provides for the following

method in determining legality under the ADA:

> An inquiry regarding disability or a medical examination of an
> employee may be "job related and consistent with business
> necessity," within the meaning of the ADA, when the employer
> has a reasonable belief based on objective evidence that:
>
>> (1) an employee's ability to perform essential job functions
>> will be impaired by a medical condition or
>>
>> (2) an employee will pose a direct threat due to a medical
>> condition.

*See also, Sullivan v. River Valley Sch. Dist.,* 197 F.3d 804, 811-12 (6th Cir.

1999)("According to the interpretation in Equal Employment Opportunity

Commission regulations, any examination ordered by the employer must be

restricted to discovering whether the employee can continue to fulfill the essential

functions of the job.").  The *Kim* Court also identified that the employer's

reasonable belief "must be based on objective evidence, obtained or reasonably

available to the employer, ***prior to*** making a disability related inquiry or requiring

a medical examination. Such belief requires an assessment of the employee and

his/her position and cannot be based on general assumption." *Id (citations

omitted)(emphasis added).*

The District Court's decision is erroneous and must be reversed because the

procedural posture leading up to the University's request for a fitness for duty

13

examination makes certain the directive was neither job related nor consistent with a business necessity. When President Thompson initially requested that Dr. Coursey undergo a "medical evaluation and/or mental health evaluation," she claimed that she was doing so based solely on the recommendation of the Grievance Board. JA 317 ("I am in receipt of the recommendation of the [Grievance Board]…In accordance with their recommendation, I am requesting that you direct Dr. Coursey to have a medical evaluation and/or mental health evaluation."). This was obviously a pretense, as Dr. Dadson, the Chair of the Grievance Board, confirmed the Board made no such recommendation. *Id.* at 318 ("I wish to humbly apprise you that the Board did not make any such recommendation for fitness of duty by medical/ psychological professionals."). Despite confirmation from the Grievance Board that a fitness for duty evaluation was not recommended, President Thompson refused to reinstate Dr. Coursey until he submitted to what the President broadly referred to as a "medical evaluation and/or mental health evaluation."

Significantly, President Thompson's June 2009 request came four months after Dr. Coursey was removed from the classroom. Had there been a legitimate concern regarding Dr. Coursey's ability to perform his job or the safety of others, the University would have requested the fitness for duty examination contemporaneously with his removal. Rather, it was only after the Grievance

14

Board recommended Dr. Coursey be allowed to return to his regular teaching

duties (*Id.* at 282-83) that President Thompson demanded the fitness for duty

exam. The decision of the Termination Board confirmed the unusual procedural

posture surrounding the President's request:

> The lack of clear and specific communication with response to the
> term 'fitness for duty' was a cause for concern for the [Termination
> Board]. UMES President, Dr. Thompson wrote a letter stating 'that
> based on the recommendation of the grievance panel, she was
> requesting a medical and/or mental health evaluation to ascertain his
> fitness for duty'…However, such a recommendation was never made
> by the initial Grievance panel…

JA 93.

The unreasonableness of Appellees' request is also shown by the lack of

specificity in the type of exam requested. For an examination to be "job-related"

and "consistent with business necessity," it must, at a minimum, be limited to an

evaluation of the employee's condition only to the extent necessary under the

circumstances to establish the employee's fitness for the work at issue. *Tice v.*

*Centre Area Transp. Authority,* 247 F.3d 506 (3rd Cir. 2001) (*citations omitted)*;

*Thomas v. Corwin*, 483 F.3d 516, 527 (8th Cir. 2007)("The employer bears the

burden to show the asserted 'business necessity' is vital to the business and the

request for a medical examination or inquiry is no broader or more intrusive than

necessary."). Here, President Thompson broadly requested that Dr. Coursey

participate in a "medical evaluation and/or mental health evaluation." JA 317 &

15

321. At no point did UMES clarify the precise nature of the requested fitness for duty examination, or even whether the examination would involve Dr. Coursey's medical *or* mental health.

In determining that the University's request was consistent with a business necessity, the lower court adopted Appellees' conclusory allegations that Dr. Coursey was acting erratically and presented a danger to the workplace. This reasoning ignores the fact that after conducting an evidentiary hearing on Dr. Coursey's removal from the classroom, the Grievance Board recommended he be reinstated. Moreover, given that President Thompson's June 2009 correspondence (JA 317), as well as her follow up July 2009 correspondence (JA 321), identify that the request was based on her false belief that the Grievance Board recommended the examination, any allegations regarding Dr. Coursey's conduct are merely afterthoughts. The case law confirms that an employer's reasonable belief must be based on evidence obtained, or available to the employer, *prior to* making a disability related inquiry. *See, Kim,* 2004 WL 3313219.

Accordingly, the request that Dr. Coursey submit to a fitness for duty examination was neither job related nor consistent with business necessity for the following reasons: (1) the request came four months after Dr. Coursey was removed from his teaching position; (2) the request was based solely on a faulty belief that the Grievance Board recommended the examination; and (3) the broad

16

request that Dr. Coursey under go a "medical evaluation and/or mental health evaluation" was not limited in scope to support an objective belief that he could not perform the essential functions of his job.  The Americans with Disabilities Act strictly prohibits employers from conducting fishing expeditions into whether an employee has a disability. The decision of the lower court must therefore be reversed.

## II.    THE DISTRICT COURT ERRONEOUSLY DETERMINED, AS A MATTER OF LAW, THAT DR. COURSEY FAILED TO PRESENT A *PRIMA FACIE* CASE OF RETALIATION UNDER THE ADA.

Dr. Coursey also alleged a violation of the ADA based on the University's retaliation against him for filing a complaint with the EEOC.  In order to establish a *prima facie* case of retaliation, a plaintiff must establish (1) that he has engaged in conduct protected by the ADA; (2) that he suffered an adverse action subsequent to engaging in the protected conduct; and (3) that there was a causal link between the protected activity and the adverse action. *Freilich v. Upper Chesapeake Health, Inc.*, 313 F.3d 205, 216 (4th Cir. 2002); *Rhoads v. FDIC,* 257 F.3d 373, 392 (4th Cir.2001).  In dismissing this claim, the District Court took issue with the third prong of this test, finding that Dr. Coursey failed to present a causal link between his EEOC complaint and subsequent termination.

Dr. Coursey was removed from the classroom on February 3, 2009 and was

17

directed to undergo a fitness for duty evaluation on June 4, 2009. JA 317.

Thereafter, Dr. Coursey filed a Charge of Discrimination with the EEOC on or

about October 28, 2009 (JA 331), and later amended his Charge in November

2010. *Id.* at 376.  The parties unsuccessfully participated in mediation before the

EEOC on February 17, 2010. *Id.* at 371-75 & 382.  While Dr. Coursey was

continuously barred from entering campus after his February 3, 2009 removal, he

did not receive official notification of his termination until May 26, 2010. *Id.* at

334. As a result, Dr. Coursey's termination came seven months after he filed his

Charge of Discrimination, and only three months after the parties' failed

mediation.

In dismissing this matter, the lower court accepted Appellees' argument that

too much time elapsed between Dr. Coursey's protected complaint and his

termination, suggesting a lack of causality between the two events. Principally, it

must be noted that temporal proximity alone cannot be used to justify a lack of

causal connection between a protected complaint and an adverse employment

action.  For instance, the Fourth Circuit has determined that "in cases where

temporal proximity between a protected activity and allegedly retaliatory conduct

is missing, courts may look to the intervening period for other evidence of

retaliatory animus." *Lettieri v. Equant Inc.,* 478 F.3d 640, 650 (4th Cir.

2007)(*citing Farrell v. Planters Lifesavers Co.,* 206 F.3d 271, 281 (3d Cir.2000)).

18

"Specifically, evidence of recurring retaliatory animus during the intervening period can be sufficient to satisfy the element of causation." *Id.*

The Plaintiff in *Lettieri* did not rely on temporal proximity to establish causation. Rather the Plaintiff in that case "pointed to continuing retaliatory conduct and animus directed at her by [Defendant] in the seven-month period between her complaint and her termination." During this seven-month period, Lettieri was denied a job transfer and stripped of significant employment responsibilities. The Fourth Circuit determined that "these intervening events-which occurred regularly after Lettieri's complaint and can reasonably be viewed as exhibiting retaliatory animus on the part of [Defendant]-are sufficient to show a causal link between Lettieri's complaint and her termination." The Fourth Circuit therefore held that despite the seven-month delay between Lettieri's complaint and her termination, Lettieri established a *prima facie* case of retaliation. *Id.* at 51.

The lower court erroneously determined that Dr. Coursey failed to identify intervening instances of retaliatory conduct or animus that suggest a causal link between his complaint and subsequent termination. In making this finding, the District Court overlooked the fact that at all times between Dr. Coursey's EEOC Charge of Discrimination and the notice of termination, Appellant remained barred from campus and was prohibited from conducting himself as a professor. Certainly, it would be difficult for UMES to further punish Dr. Coursey when he

19

had already been subjected to one of the most severe forms of discipline: suspension. Moreover, while Dr. Coursey's actual termination did not arrive until seven months after his EEOC Complaint, UMES continued to punish Dr. Coursey in the months leading up to his termination by refusing to lift the academic probation and demanding that he participate in an illegal fitness for duty evaluation. Furthermore, Dr. Coursey's termination came only three months after the parties failed to reach an agreement through the EEOC's mediation process, further bolstering the claim that Dr. Coursey's termination was linked to his EEOC Complaint.

Dr. Coursey presents additional evidence depicting the link between his EEOC Complaint and his termination. Most compelling is the fact that UMES submitted Dr. Coursey's EEOC Complaint into evidence at his termination hearing. Further, UMES presented testimony of the parties' failed attempt to mediate Dr. Coursey's Complaint through the EEOC. JA 371-75. If UMES did not intend to rely upon Dr. Coursey EEOC's Complaint as a basis for his termination, there would be no reason to submit his Complaint into evidence at his termination proceeding. Accordingly, the facts leadings up to and surrounding Dr. Coursey's termination support a causal link between his protected complaint and his termination.

The District Court also found that, even assuming Dr. Coursey established a

*prima facie* case of retaliation, UMES had a non-discriminatory, non-pretextual reason for his termination. *Id.* at 398. In doing so, the lower court relied on the findings of incompetence and professional misconduct made by the Termination Board and Board of Regents. Once an employee establishes a *prima facie* case of retaliation under the ADA, "the employer then has the burden to rebut the presumption of retaliation by articulating a legitimate nonretaliatory reason for its actions." *Rhoads v. F.D.I.C.*, 257 F.3d 373, 392 (4th Cir. 2001)(*internal citations omitted*). Once a Defendant offers a legitimate, nondiscriminatory reason for the termination of a Plaintiff, "the Plaintiff must than have an opportunity to prove... that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for" retaliation. *Campbell v. Prince George's County Maryland*, 2001 WL 706039 (D. Md.). Dr. Coursey can show pretext by demonstrating that UMES' explanation is "unworthy of credence" or by "offer[ing] other forms of circumstantial evidence sufficiently probative of intentional discrimination." *Dugan v. Albemarle County Sch. Bd.,* 293 F.3d 716, 721 (4th Cir. 2002).

To establish a fact issue on pretext, a plaintiff must present evidence that: (1) creates a factual dispute as to whether the employer's proffered reasons for taking adverse employment action are pretextual; and (2) allows a reasonable jury to infer that the employer's action was motivated by a discriminatory animus. *Allen v. Interior Const. Services, Ltd.*, 214 F.3d 978, 983 (8th Cir. 2000). Here, two

separate Boards reviewed Dr. Coursey's job performance. The Grievance Board determined that Dr. Coursey should be reinstated, while the Termination Board determined that Dr. Coursey should be terminated. Given that the evidence presented to the Boards was substantially similar, at the very least, a factual dispute exists as to whether the University had grounds to terminate Dr. Coursey. Accordingly, the lower court erred in finding a legitimate, nondiscriminatory reason based on the Termination Board's decision, as that decision itself is suspect and creates a factual dispute. When viewing the facts in the light most favorable to Dr. Coursey, the Court must accept the Grievance Board's findings that Appellant should have been reinstated, thus rebuffing the notion that UMES possessed a non-pretextual basis for his termination.

### III. THE DISTRICT COURT ERRONEOUSLY DETERMINED, AS A MATTER OF LAW, THAT DR. COURSEY FAILED TO PRESENT A *PRIMA FACIE* CASE OF DISCRIMINATION.

Dr. Coursey alleged that UMES discriminated against him in violation of both the Americans with Disabilities Act and the Rehabilitation Act by removing him from the classroom, requesting that he undergo a fitness for duty examination, and ultimately terminating him as a result of a bogus perception that he is disabled. Title I of the ADA prohibits discriminatory discharge of "a qualified individual with a disability because of the disability." *Porter v. U.S. Alumoweld Co., Inc.*, 125 F.3d 243, 246 (4th Cir. 1997). Specifically, 42 U.S.C.A. § 12112 (a) provides that

22

"no covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." Although the wording is slightly different, "the ADA and Rehabilitation Act generally are construed to impose the same requirements" and the same analysis is applied to both. *Baird ex rel. Baird v. Rose*, 192 F.3d 462, 468 (4th Cir. 1999).

In order to establish a *prima facie* case under Title 1 of the ADA, Dr. Cousey must show the following: (1) he was in the protected class; (2) he was discharged; (3) at the time of the discharge, he was performing his job at a level that met his employer's legitimate expectations; and (4) his discharge occurred under circumstances that raise a reasonable inference of unlawful discrimination. *Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.,* 53 F.3d 55, 58 (4th Cir. 1995). Similarly, under the Rehabilitation Act, Dr. Coursey must show:  (1) that he has a disability; (2) that he is otherwise qualified for the employment or benefit in question; and (3) that he was excluded from the employment or benefit due to discrimination solely on the basis of the disability. *Lassiter v. Reno*, 86 F.3d 1151 (4th Cir. 1996).

The lower court dismissed Dr. Coursey's discrimination claims solely on the theory that Appellant is not within the necessary protected class because he failed

to show that UMES regarded him as disabled.  Under the ADA, a person is disabled, and within the protected class, if he meets any of three criteria: 1) a physical or mental impairment that substantially limits one or more of the major life activities; 2) a record of such an impairment; or 3) being regarded as having such an impairment[2]. 42 U.S.C.A. § 12102(1). Under the "regarded as" criterion of the ADA, "an individual meets the requirement of 'being regarded as having such an impairment' if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C.A. § 12102(3)(a). Under this test, "a plaintiff need demonstrate only that the employer regarded him as being impaired, not that the employer believed the impairment prevented the plaintiff from performing a major life activity. *Wolfe v. Postmaster Gen.*, 488 F. App'x 465, 468 (11th Cir. 2012). "An individual is 'regarded as having such an impairment' any time a covered entity takes a prohibited action against the individual because of an actual or perceived impairment, even if the entity asserts, or may or does ultimately establish, a defense to such action." 29 CFR § 1630.2 (l)(2).

Contrary to the holding of the lower court, there is sufficient evidence in this

---

[2] The Rehabilitation Act incorporates the definition of "disability" given under the ADA. 29 U.S.C.A. § 705(9)(b).

matter to establish that UMES regarded Dr. Coursey as possessing a physical and/or mental impairment.  Importantly, a request for a fitness for duty examination may, "taken in conjunction with other evidence or circumstances surrounding the request, establish that the employer regarded the employee as disabled." *Tice v. Ctr. Area Transp. Auth.*, 247 F.3d 506, 516 (3rd Cir. 2001). The *Tice* Court explained that if an employer's examination is "not limited to an assessment of those potential impairments that had occasioned the examination in the first place, but instead became a wide-ranging assessment of mental or physical debilitation, such evidence might be highly probative as to the nature of the employer's perception." *Id. (citations omitted).* "Further, a request for an examination, taken in conjunction with evidence suggesting that the employer had no reasonable basis for harboring doubts about the employee's ability to do his or her job in the first place, might also be probative as to the nature of the employer's regard." *Id*

As shown above, Appellees' request that Dr. Coursey submit to a fitness for duty evaluation was neither job related nor consistent with a business necessity. President Thompson's demand that Dr. Coursey submit to a "medical evaluation and/or mental health evaluation" is just the wide-ranging assessment of mental or physical debilitation that the *Tice* Court confirmed is prohibited under the ADA.

The fact that Dr. Coursey was physically removed from campus by

25

University police – an action much too dramatic of the occasion - further bolsters his allegation that UMES officials regarded him as disabled. At the time of his removal, Dr. Coursey was the most senior faculty member on campus, and had worked exclusively for UMES for over 38 years. Dr. Coursey had no prior history of being dangerous, aggressive, or otherwise unstable, and was promoted to "full professor" just eight years prior. JA 247.  Clearly, the University's perception of Dr. Coursey changed in 2009 when UMES officials thought it necessary to engage police assistance in removing their most senior faculty member from campus.

The record in this matter is overflowing with references that UMES considered Dr. Coursey as possessing a mental impairment.  JA 53 ("UMES was also increasingly concerned that his inappropriate behavior seemed to be increasing in intensity and inappropriateness and immediate action needed to be taken to protect the students and possibly colleagues"); *Id.* at 92 ("While Dr. Coursey seemed to have demonstrated professional demeanor for most of his career…there was an escalation of inexplicable behavior that caused his immediate supervisors, professional colleagues and administrators great concern); *Id.* at 160 ("Dr. William stated in his letter to Dr. Coursey he had decided to remove Dr. Coursey from all classes to protect the interest of students"); *Id.* at 319 ("the University is concerned not just for your client's health…").  Certainly there is no need to remove a tenured faculty member with no history of aggression in the

26

manner employed by UMES unless the faculty member is regarded as possessing a mental disability that could result in violent behavior. In fact, UMES even went so far in its Motion for Summary Judgment as to compare the behavior of Dr. Coursey to that of the mentally ill individual who violently massacred students at Virginia Tech[3].

Dr. Coursey presented sufficient evidence that his employer regarded him as disabled and demanded that he submit to a fitness for duty evaluation in order to determine the nature and extent of the perceived disability. At the very least, given that Dr. Coursey is entitled to the benefit of all justifiable inferences[4], he has undoubtedly raised a genuine issue of fact as to whether UMES' regarded him as possessing a disability under the ADA and the Rehabilitation Act. Accordingly, the lower court's decision that Dr. Coursey does not fall within the class of individuals covered by these Acts must be reversed.

## **CONCLUSION**

Dr. Coursey respectfully requests that this Honorable Court reverse the

---

[3] Appellees' Summary Judgment Memorandum provides "in the aftermath of the Virginia Tech shootings, Universities have a heightened sensitivity to threatening, abusive, and violent behavior and a *legal obligation* to address this behavior."

[4] In reviewing the evidence as it relates to a motion for summary judgment, the trial court must "view all evidence in the light most favorable to the non-moving party." *Shealy v. Winston*, 929 F.2d 1009, 1011 (4th Cir. 1991). Moreover, "credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). At the summary judgment stage of a proceeding, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* To the extent facts are disputed, the court must view those facts in a light most favorable to the non-moving party. *Pueschel v. Peters*, 577 F.3d 558, 563 (4th Cir. 2009).

decision of the United States District Court for the District of Maryland, remand the case to that Court for further proceedings, and grant Dr. Coursey such other and further relief as the nature of his cause may warrant.

Respectfully submitted,

_____/s/_____
ROBIN R. COCKEY
COCKEY, BRENNAN & MALONEY, PC
313 Lemmon Hill Lane
Salisbury MD 21801
(410) 546-1750
Attorneys for Appellant

28

## **REQUEST FOR ORAL ARGUMENT**

Appellant respectfully requests oral argument.


_____/s/_____
ROBIN R. COCKEY
COCKEY, BRENNAN & MALONEY, PC
313 Lemmon Hill Lane
Salisbury MD 21801
(410) 546-1750
Attorneys for Appellant

29

## UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

**No.** 13-1626 **Caption:** Leon Coursey v. University of Maryland Eastern Shore, et al.

### CERTIFICATE OF COMPLIANCE WITH RULE 28.1(e) or 32(a)
Certificate of Compliance With Type-Volume Limitation,
Typeface Requirements, and Type Style Requirements

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

*[Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 14,000 words or 1,300 lines; Appellee's Opening/Response Brief may not exceed 16,500 words or 1,500 lines; any Reply or Amicus Brief may not exceed 7,000 words or 650 lines; line count may be used only with monospaced type]*

    [X]    this brief contains 6,207 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

    [ ]    this brief uses a monospaced typeface and contains _____[*state the number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

*[14-point font must be used with proportional typeface, such as Times New Roman or CG Times; 12-point font must be used with monospaced typeface, such as Courier or Courier New]*

    [X]    this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2003 [*state name and version of word processing program*] in Times New Roman 14 point font [*state font size and name of the type style*]; *or*

    [ ]    this brief has been prepared in a monospaced typeface using _____ _____ [*state name and version of word processing program*] with_____ _____[*state number of characters per inch and name of type style*].

_____/s/_____

Attorney for Appellant_____

Dated: June 21, 2013_____

30

## CERTIFICATE OF SERVICE

I certify that on  June 21, 2013     the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving two true and correct copies at the addresses listed below:


      Susan A. Griisser
      Assistant Attorney General
      Educational Affairs Division
      200 St. Paul Place, 17th Floor
      Baltimore, Maryland 21202-2021


_____/s/_____        __June 21, 2013_____
Signature                                              Date

31